IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

                Respondent,

    v.

JETTA J. YOUKER,

                Appellant.

No. 86400-9-I

DIVISION ONE

UNPUBLISHED OPINION

COBURN, J. — Jetta Youker's 22nd birthday celebration ended with him strangling his girlfriend Mackenzie Blackburn. About five years later a reluctant Blackburn testified at Youker's trial saying she loved him and did not want to see him get in trouble. A jury convicted Youker of assault in the second degree by strangulation against an intimate partner. Youker claims that the trial court (1) violated his constitutional right to present a defense by improperly limiting his cross-examination of witnesses regarding a non-related incident involving the couple; (2) improperly admitted Blackburn's hearsay statements; and (3) improperly denied his request for a mistrial after the State's nurse-witness assisted a fainted juror during trial. We disagree and affirm.

FACTS

In February 2022 the State charged Youker with domestic violence assault in the second degree by strangulation. The State alleged that on February 17, 2019, Youker assaulted Blackburn, his girlfriend, by throwing her to the ground, beating her, and

squeezing her neck with both of his hands so that she struggled to breathe. At trial Youker's theory of the case was that he had an altercation with Blackburn during which he restrained Blackburn on the floor to prevent her from hitting him but did not strangle her. The State presented testimony from multiple witnesses, including Blackburn, Everett Police Department Sergeant Michael Drake, and forensic nurse examiner Linnea Rodriguez.

The charged incident began on the evening of February 16, 2019, when Blackburn and Youker went out to celebrate his 22nd birthday. They met up with friends at an arcade where they both drank alcohol. Blackburn later drove herself and Youker from the arcade to a drive-through restaurant to get food.

Blackburn provided a written statement to police describing what happened next, which was both admitted and read aloud to the jury at trial over Youker's objection. See ex. 5. Youker yelled at Blackburn for "ruining his birthday." Id. at 1. Blackburn asked Youker to get out of her car. Id. Youker took Blackburn's key ring and removed her keys to their shared apartment. Id. In the process of getting her car keys back from Youker, one of the keys cut Blackburn's finger. Id. Youker then grabbed Blackburn's hair, yanked her neck, pulled some of her hair out, and told her she "was fucking stupid." Id. Youker got out of the car and left. Id.

Blackburn went back home and waited for Youker, where he later met her with the keys. Id. at 1-2. When Youker had trouble opening the door, Blackburn offered to help him. Id. at 2. Youker told her, "I don't fucking need your help go home this isnt your home anymore." Id. Blackburn "slapped/pushed" Youker in the face. Id. Youker then threw Blackburn down on the ground, grabbed her hair with both of his hands, slammed

2

her head into the ground, and started hitting her repeatedly for several minutes. Id. Eventually, Youker told Blackburn to get her things, pushed her, and pulled her up off the ground. Id. Youker then followed Blackburn into a room where she pretended to get her things. Id. Blackburn asked Youker if she could go to the bathroom. Id. After she went into the hallway, Blackburn ran toward the apartment door and opened it. Id. Youker grabbed Blackburn by the neck, slammed her into the floor, covered her mouth after she started screaming for help, and strangled her. Id. Blackburn stated she would "never forget the look in his eyes or the fear I felt in that moment. I thought he was going to kill me." Id. Youker told Blackburn he would not stop hitting her unless she called the police. Id. at 2-3. Blackburn wrote, "I didn't want to at first but after he kept hitting me in the face and pulling my hair and strangling me I said ok Jetta i'll call the cops." Id. at 3. Youker pulled Blackburn's hair again and smacked her head onto the floor before leaving her alone and sitting on the couch. Id. Blackburn then called 911 and started screaming for help. Id.

Upon his arrival at the apartment complex where the incident occurred, Sergeant Drake observed Blackburn writhing in pain on the floor and crying. Blackburn's face and orbital socket were swollen. She had blood around her face, mouth, teeth, and lips. Blackburn also had a red mark on the front of her neck and horizontal lines on each side of her neck that were about the width of a finger and separated by a width of a finger. Blackburn reported to Drake that when she and Youker were back at their apartment, Youker grabbed her around the throat with both of his hands and squeezed, causing her to gasp for air.

Blackburn was taken to Providence Hospital in Everett, where Drake photographed her injuries. See exs. 19-22. At the hospital, Providence forensic nurse examiner Rodriguez met with Blackburn for about three hours to discuss the assault and assess her for strangulation injuries. Blackburn told Rodriguez that Youker put both of his hands around her throat and choked her, causing her to black out "a couple of time[s]." Blackburn also described Youker as facing her, placing his hands on her neck, and pressing his thumbs on the sides of her windpipe. Blackburn had various symptoms consistent with being strangled, including red eyes, breathing changes, difficulty swallowing, neck pain, and neck swelling. Rodriguez observed horizontal linear bruises and vertical bruises on the left side of Blackburn's neck. Blackburn also had two lacerations on the left side of her neck with fingernail-size scratch marks, as well as horizontal bruising on the right side of her neck. Based upon Rodriguez's examination, Blackburn's injuries were consistent with someone placing their hands around Blackburn's throat and squeezing. Rodriguez took photographs of Blackburn's injuries. Blackburn was discharged from the hospital after Rodriguez's examination. Blackburn provided her written statement, later admitted as exhibit 5 at trial, to Drake the following morning.

The record indicates that police who responded to the scene interviewed Youker and arrested him but that he was not charged until February 2022. Between the February 2019 incident and February 2022, Blackburn called 911 in October 2019 to report a contemporaneous new allegation of domestic violence strangulation against Youker. Everett Police Department Officer Christopher Rolling responded to the call and spoke to both Youker and Blackburn to get their version of events. After the officer told

4

Blackburn that he had watched "a video,"[1] Blackburn changed her version of events regarding the October incident, which apparently did not result in charges against Youker.

In February 2022 the State charged Youker with assault in the second degree by strangulation (domestic violence) based on the February 2019 incident. Trial proceeded in February 2024.

At trial Blackburn expressed reluctance to cooperate with the State. Blackburn testified she loved Youker and did not want to see him get in trouble or be prosecuted. Blackburn recalled certain details of the February 2019 incident but not others. Blackburn testified that she would remember if Youker had choked her to the point where she could not breathe, and her memory was that she could breathe the entire time and that she did not remember Youker strangling her. Blackburn said she did not remember a lot of things that she wrote in her police statement and could not recall "what I did or what happened."

Over defense objection, the trial court admitted Blackburn's written statement to police as a "Smith affidavit."[2] The court, over Youker's objection, also allowed forensic nurse Rodriguez to testify as to what Blackburn told her under an ER 803(a)(4)

---

[1] The record does not explain the source of the video or its contents. Read in context, it is presumably a video of the alleged October 2019 incident.

[2] In State v. Smith, 97 Wn.2d 856, 861-63, 651 P.2d 207 (1982), our Supreme Court held that a victim's prior written statement provided to law enforcement can be substantively admitted as a prior inconsistent statement under the ER 801(d)(1)(i) hearsay exception when the victim signs the affidavit under penalty of perjury and certain other factors are satisfied. See State v. Nelson, 74 Wn. App. 380, 386-87, 874 P.2d 170 (1994) (discussing Smith, 97 Wn.2d at 858-61).

exception to hearsay. Additionally, the photographs that Rodriguez and Sergeant Drake took of Blackburn's injuries were admitted. See exs. 19-22.[3]

The jury convicted Youker as charged. Youker appeals.

DISCUSSION

Constitutional Right to Present a Defense

Youker contends that the trial court violated his constitutional right to present a meaningful defense by not allowing him to elicit testimony that Blackburn was arrested for domestic violence and malicious mischief after the October 2019 incident when Blackburn called police, and that Blackburn engaged in therapy following that incident.

Both the Sixth Amendment to the U.S. Constitution and article I, section 22 of the Washington Constitution guarantee a defendant's right to present a defense. State v. Jennings, 199 Wn.2d 53, 63, 502 P.3d 1255 (2022). The trial court must provide the accused with "'a fair opportunity'" to defend against the government's accusations. State v. Jones, 168 Wn.2d 713, 720, 230 P.3d 576 (2010) (quoting Chambers v. Mississippi, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)). The right to present a defense is satisfied through meaningful cross-examination, which is designed to expose a witness' bias. State v. Darden, 145 Wn.2d 612, 620, 41 P.3d 1189 (2002); State v. Orn, 197 Wn.2d 343, 347, 482 P.3d 913 (2021). However, a defendant's right to present a defense is limited by the general rules of evidence. Darden, 145 Wn.2d at 621. The Constitution allows judges the discretion to "'exclude evidence that is repetitive …, only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues.'" Jennings, 199 Wn.2d at 63 (alterations in original) (internal quotation marks

---

[3] The photographs taken by Rodriguez during her examination of Blackburn were not designated in the record on appeal, but are supported by Rodriguez's testimony.

omitted) (quoting Holmes v. South Carolina, 547 U.S. 319, 326-27, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006)).

We conduct a two-step process to review a trial court's evidentiary rulings and the defendant's right to present a defense. Id. at 58. First, we review the trial court's evidentiary ruling for abuse of discretion. Id. "Trial courts determine whether evidence is relevant and admissible." Id. at 59. If we conclude that the trial court made a prejudicial[4] evidentiary error at the first step, our review ends and we "avoid the constitutional issue altogether." Id. (internal quotation marks omitted).

Second, if we conclude that the trial court did not abuse its discretion in excluding the evidence or that the error was not prejudicial, we consider de novo whether the court's exclusion of the evidence violated the defendant's constitutional right to present a defense. Id. at 58.

Where evidence is at least minimally relevant a reviewing court "must weigh the defendant's right to produce relevant evidence against the State's interest in limiting the prejudicial effects of that evidence to determine if excluding the evidence violates the defendant's constitutional rights." Id. at 63. The exclusion of evidence does not violate defendants' right to present a defense if defendants are still able to present relevant evidence necessary to support their defense theory. Id. at 67; State v. Arndt, 194 Wn.2d 784, 812-13, 453 P.3d 696 (2019). Importantly, because a defendant has "no constitutional right to present irrelevant evidence," the excluded evidence must be at least minimally relevant to implicate the right to present a defense. Jones, 168 Wn.2d at 720. Relevant evidence is evidence that has "any tendency to make the existence of

---

[4] If we find that a trial court erred in applying the evidence rules, we then determine whether the court's error was harmless. Jennings, 199 Wn.2d at 59.

any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401.

Here, Youker filed a motion asking the trial court to allow testimony regarding Blackburn's October 2019 false allegation of strangulation against Youker and Blackburn's engagement in therapy following the incident. In its oral ruling following a pre-trial hearing, the court observed that some testimony regarding the strangulation accusation in October was relevant because it involved similar facts, such as that the incident occurred at home following a celebration, alcohol was involved, and that the second accusation came from the same victim. However, the court ruled that the fact of Blackburn's arrest "has no relevance [as to] whether she made a false statement about [Youker]." The court also determined that the fact that Blackburn went to therapy was not relevant.

Accordingly, the trial court allowed defense to question Blackburn about the fact that she made a false allegation of strangulation against Youker in October 2019 but barred defense from asking about certain facts related to the incident, including the fact that Blackburn was arrested and that she later went to therapy. The court also prohibited Youker from questioning his rebuttal witness Officer Rolling about the fact that he arrested Blackburn following the October incident.

Youker does not provide argument to challenge the trial court's evidentiary ruling that testimony regarding Blackburn's arrest and her engagement in therapy was not relevant. Rather, relying on State v. Lee, 188 Wn.2d 473, 488, 396 P.3d 316 (2017), Youker claims that trial court was required to consider "three factors" in regard to the admission of the excluded evidence: "(1) the evidence must be relevant, (2) the State

must show the evidence is 'so prejudicial as to disrupt the fairness of the fact-finding process at trial' and (3) the State's interest must be 'balanced against the defendant's need for the information sought.'" Citing the trial court's ruling that some evidence regarding Blackburn's false accusation of strangulation was relevant to the instant matter, Youker asserts that the trial court erred in its analysis as to whether the excluded evidence would rise to the level of disrupting fairness at trial under the purported "second factor" of the Lee analysis.

Youker mischaracterizes the holding from Lee. In Lee, the court considered the defendant's appeal of his child rape convictions and whether the trial court violated his constitutional right to cross-examine the victim when it precluded him from specifying that the victim's prior false accusation against a different person was a rape accusation. 188 Wn.2d at 478, 480, 485-87. The Lee court decided that the minimal probative value of the specific nature of the accusation was outweighed by the State's interest in limiting prejudice; specifically, the risk that the admission of such evidence may discourage future sexual assault victims from reporting their assaults or from participating in prosecution. Id. at 495. The court determined that the State's interest outweighed Lee's need for the excluded evidence because he was not prevented from generally asking the victim about the false accusation or attacking the victim's credibility. Id. at 495-96.

In setting out the applicable test, the Lee court, as later emphasized in Jennings, explained that the trial court must only weigh the State's interest against the defendant's interest if the excluded evidence is minimally relevant. Id. at 488. The Lee court stated:

> First, the evidence must be of at least minimal relevance. Second, if relevant, the burden is on the State to show the evidence is so prejudicial as to disrupt the fairness of the fact-finding process at trial. Finally, the State's interest to exclude prejudicial evidence must be balanced against

the defendant's need for the information sought, and only if the State's interest outweighs the defendant's need can otherwise <u>relevant information</u> be withheld.

Id. (emphasis added) (quoting <u>Darden</u>, 145 Wn.2d at 622). In the instant case, the trial court determined that the excluded evidence was not relevant to defense's goal of proving that Blackburn falsely accused Youker. Under <u>Jennings</u>, because Youker does not challenge the trial court's evidentiary ruling, we next consider de novo whether the court's exclusion of the evidence violated the defendant's constitutional right to present a defense.

Youker sought to admit the evidence to show that Blackburn falsely accused him of strangulation under similar circumstances in October 2019. Youker elicited testimony from Blackburn and responding officer Rolling.

On cross Blackburn testified that law enforcement responded to her and Youker's shared apartment one night in October after they went to a Halloween party. Defense asked Blackburn:

Q.    Do you remember being mad at [Youker] that evening in October?
A.    At some point.
Q.    Do you remember that you two got into an argument?
A.    No.
Q.    Do you remember calling 9-1-1?
A.    No.
Q.    Ms. Blackburn, are you telling this jury that in October of 2019, you did not call 9-1-1?
A.    I want to make it clear that I don't remember. I was highly intoxicated and under the influence of multiple drugs.
Q.    Ms. Blackburn, did you report to law enforcement in October 2019 that you were strangled?
A.    I don't remember.
Q.    Do you remember talking to law enforcement in October 2019?
A.    I remember talking to police officer when they came and picked up the statement. I don't remember anything that happened that night from the police officers, no, I do not remember.

Q.      So I am talking about the October incident. The police did not come pick up a statement from you that night; correct?

A.      Okay. Well, I don't know. Are you talking about the time I was arrested?

[Prosecutor]: Objection.

THE COURT: The jury will disregard the statement by the witness regarding the time she was arrested.

[Prosecutor]: Move to strike.

THE COURT: It is stricken from the record.

…

[Defense]:

Q.      I am talking about the incident in October 2019 when law enforcement showed up to your house after the Halloween party. So that incident, the night of the Halloween party you were interviewed by law enforcement; correct?

A.      I do not remember speaking to them.

Q.      Okay. Do you remember being confronted with a video by law enforcement?

Q.      Do you remember admitting to law enforcement that the video was accurate?

A.      No.

Q.      When we interviewed you in December, you talked about this incident; correct?

A.      I don't remember.

Q.      You told us during the defense interview that you made a false allegation against [Youker] because you were mad; correct?

A.      Are you referring to October?

Q.      Yes, I am talking about October, unless I tell you otherwise.

A.      Then, yeah, sure.

Q.      Okay. <u>So, yes, sure you did make a false allegation against [Youker] in October of 2019?</u>

A.      <u>Yes.</u>

Q.      You made that false allegation to law enforcement?

A.      I do not remember.

Q.      The only people that were at your house that night were you; correct?

A.      I understand that, but I don't think you are understanding. I don't remember talking to the police. I don't remember making a phone call or doing anything. I already specified I was highly intoxicated and under the influence of drugs. How do you expect me to remember something that I simply don't remember?

Q.      Okay. Ms. Blackburn, you wanted Mr. Youker to go to jail on the night of October 2019; correct?

A.      I don't know.

(Emphasis added.) Youker's assertion that he was not permitted to refresh Blackburn's recollection about the October incident is not supported by the record. Defense did not request to refresh Blackburn's recollection during the portion of her cross-examination that Youker refers to in his briefing.[5] Instead, the trial court sustained the State's objection upon Blackburn's inquiry as to whether defense was referring to the time that she "was arrested" by instructing the jury to disregard the statement related to being arrested. This was consistent with the trial court's prior ruling.

Defense questioned Officer Rolling regarding his interactions with Blackburn when he responded to Blackburn's 911 call:

> [Defense:]     I want to talk next about an incident in October 2019. Did you respond to a call regarding a strangulation at … [an apartment] in Everett?
> A.     Yes.
> Q.     Who placed that 9-1-1 call?
> A.     Mackenzie Blackburn.
> Q     And did you respond to that 9-1-1 call?
> A.     I did.
> …
> Q.     When you responded, did you do any investigation as part of that call?
> A.     Yes.
> Q.     Who was at the apartment when you arrived?
> A.     Two folks were there, Mackenzie Blackburn and Jetta Youker.
> Q.     Did you separate the parties?
> A.     Yes.
> Q.     Did you ask Ms. Blackburn her version of events?
> A.     Yes.
> Q.     Did you ask Mr. Youker his version of events?
> A.     Yes.
> Q.     Did you then watch a video?
> A.     I did.
> Q.     Did you then confront Ms. Blackburn as to what you saw in the video without actually telling her that you had seen the video?
> A.     Yes.

---

[5] Defense previously used a recording of a defense interview with Blackburn to refresh her memory on another topic during trial.

…
Q.      … Did [Blackburn] change what she said before you told her you watched the video?
A.      After.
Q.      … [O]nce you told her you watched a video, is that when she changed her version of events?
A.      Yes.
Q.      She admitted that the video was probably accurate?
A.      Yes.
[Defense]: No further questions, Your Honor.

The record establishes that even without evidence of Blackburn's arrest and post-arrest therapy, Youker presented evidence to support his defense theory that Blackburn was not credible by introducing evidence of her false accusation following the October 2019 incident. We therefore conclude that Youker's right to present a defense was not violated.

## ER 801(d)(1)(i)

Youker contends that the trial court abused its discretion in admitting Blackburn's written statement provided to law enforcement as an inconsistent prior written statement under ER 801(d)(1)(i).

We generally review a trial court's decision to admit or exclude evidence for abuse of discretion. State v. Griffin, 173 Wn.2d 467, 473, 268 P.3d 924 (2012). "A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons." State v. Lord, 161 Wn.2d 276, 283-84, 165 P.3d 1251 (2007). "A trial court abuses its discretion if 'no reasonable person would take the view adopted by the trial court.'" Jennings, 199 Wn.2d at 59 (internal quotation mark omitted) (quoting State v. Atsbeha, 142 Wn.2d 904, 914, 16 P.3d 626 (2001)).

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER

13

801(c). Hearsay statements are not typically admissible. ER 802. However, under ER

801(d)(1)(i), a prior inconsistent statement is not hearsay if

> [t]he declarant testifies at the trial or hearing and is subject to cross examination concerning the statement, and the statement is (i) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition.

"Because such a statement is not hearsay, it is admissible at trial as substantive

evidence." State v. Otton, 185 Wn.2d 673, 679, 374 P.3d 1108 (2016). In determining

whether evidence should be admitted under ER 801(d)(1)(i), "reliability is the key." State

v. Smith, 97 Wn.2d 856, 861, 651 P.2d 207 (1982). "[A] trial judge has considerable

discretion in determining whether testimony is inconsistent with prior statements." State

v. Phillips, 6 Wn. App. 2d 651, 671, 431 P.3d 1056 (2018) (internal quotation marks

omitted).

Here, the State moved to admit Blackburn's prior written statement, signed under

penalty of perjury,[6] provided to Sergeant Drake as substantive evidence under ER

801(d)(1)(i). See Smith, 97 Wn.2d at 861. Youker objected to the admission, arguing

that Blackburn's testimony was not inconsistent with the prior police statement. Relying

on this court's decision in Phillips, 6 Wn. App. 2d at 668-72, the trial court admitted the

statement.

In Phillips, we held that the trial court did not abuse its discretion by admitting a

domestic violence victim's prior written statement to law enforcement that Phillips had

choked her. Id. At trial the victim was reluctant to cooperate with prosecution and denied

some facts included in her written statement, including that Phillips punched her in the

---

[6] Ex. 5 at 1.

14

chin and pushed her to the ground. Id. at 669-71. Instead, she testified that the altercation with Phillips "got physical, with grabbing and pushing and pulling" and "tussling." Id. at 669-70 (internal quotation marks omitted). She also testified she could not remember whether Phillips choked her but that she remembered telling law enforcement that Phillips grabbed her throat, causing her to feel like she was going to pass out. Id.

We observed that inconsistency for the purposes of ER 801(d)(1)(i) is not determined merely by individual words or isolated phrases, "'but by the whole impression or effect of what has been said or done.'" Id. at 671 (internal quotation marks omitted) (quoting State v. Dickenson, 48 Wn. App. 457, 467, 740 P.2d 312 (1987)). Thus, inconsistency between a witness' testimony and prior written statement "'is not limited to diametrically opposed answers but may be found in evasive answers, inability to recall, silence, or changes of position.'" Id. (quoting United States v. Dennis, 625 F.2d 782, 795 (8th Cir. 1980)).[7] Accordingly, we held:

> [The victim's] forgetfulness was sporadic and seemed to demonstrate an intent to be evasive, and not actual loss of memory. For example, [she] testified that she did not remember being choked, but that

---

[7] See also United States v. Barrett, 539 F.2d 244, 254 (1st Cir. 1976) ("To be received as a prior inconsistent statement, the contradiction need not be 'in plain terms. It is enough if the proffered testimony, taken as a whole, either by what it says or by what it omits to say, affords some indication that the fact was different from the testimony of the witness whom it is sought to contradict.'") (quoting Commonwealth v. West, 312 Mass. 438, 440, 45 N.E.2d 260 (1942)); United States v. Williams, 737 F.2d 594, 608 (7th Cir. 1984) (holding that an ostensible change in memory can also produce "inconsistent" answers, "[p]articularly in a case of manifest reluctance to testify"); United States v. Distler, 671 F.2d 954, 958 (6th Cir. 1981) ("We think it clear that, for purposes of this rule, partial or vague recollection is inconsistent with total or definite recollection. Thus, when a witness remembers events incompletely, or with some equivocation at trial, it is not improper to admit a prior statement that otherwise complies with the limitations of Rule 801(d)(1), if that prior statement indicates that at an earlier time the witness remembered the events about which he testifies with more certainty or in more detail."); United States v. Thompson, 708 F.2d 1294, 1302 (8th Cir. 1983) (holding that district court did not abuse its discretion in determining that evasive answers from recalcitrant and hesitant witness were inconsistent with his previously given statements).

she did remember telling the police that she had been choked. The impression or effect of these statements would be that she was never choked by Phillips on the night of the assault, and is undoubtedly inconsistent with her victim statement.

Id. at 672.

Youker's argument that the instant case is distinguishable from Phillips because the record does not support that Blackburn's forgetfulness at trial was indicative of evasiveness is not persuasive. In applying Phillips to the instant record, the central question is whether Blackburn's testimony, taken as a whole, left the impression or effect that Youker did not strangle her during the assault. See id. at 671-72.

Like the victim in Phillips, Blackburn was reluctant to participate in prosecution. Blackburn was subpoenaed to appear for instructions and ordered by the court to appear as a witness. She testified she loved Youker and, after being "[o]n and off," was dating him again at the time of trial. Blackburn said she did not want the case prosecuted or "brought up again ever" and that she did not "want anything to do with this trial."

At trial Blackburn remembered some facts consistent with her written statement but not others. For example, she remembered that Youker shoved her to the ground and that he grabbed her hair with both of his hands while she was on the ground. But she could not remember if Youker ever hit her when she was on the ground, how she got up from the ground, or that she called the police. Blackburn did not recall at trial that Youker strangled her or whether she felt like he was going to kill her. She indicated she did not remember what she told Sergeant Drake about the assault when he responded to the incident. Drake testified that when he responded to the scene, Blackburn described to him that when she ran for the door, Youker pulled her back into the

apartment, began hitting her again, grabbed her by the hair, knocked her to the floor, got on top of her, slapped her head against the floor, and grabbed her throat with both hands and squeezed. Drake testified that Blackburn said she was gasping for air and felt like Youker was going to kill her. When asked directly if she remembered anything that she told Sergeant Drake, Blackburn said, "I want to make it very clear that I do not remember a lot of things that happened. It was long time ago." Yet, Blackburn did testify that there was never a time she could not breathe and that she would remember if she was choked to the point of not being able to breathe. Blackburn admitted that she wrote the statement about the February 2019 incident that she gave to police but did not remember "a lot of things" she wrote in the statement.

Taken as a whole, we conclude that Blackburn's testimony reasonably leaves the impression that Youker did not strangle her during the assault, which is objectively inconsistent with her prior written statement.

Youker also attempts to distinguish the instant matter based on the fact that Blackburn's testimony was five years after the alleged incident as compared to the three months between the victim's testimony and the charged incident in Phillips. This court in Phillips, however, did not rely on the relative timeframe between the written statement and the victim's testimony in its analysis of the admissibility of the prior police statement under ER 801(d)(1)(i). See 6 Wn. App. 2d at 671-72. To do so would run contrary to the principle that "[i]n many cases, the inconsistent statement is more likely to be true than the testimony at trial as it was made nearer in time to the matter to which it relates and is less likely to be influenced by factors such as fear or forgetfulness." Smith, 97 Wn.2d at 861. Moreover, considering the trial court's wide discretion in determining whether

Blackburn's testimony was "inconsistent" to permit the admission of her prior police statement under ER 801(d)(1)(i), this factual difference does not render the trial court's ruling unreasonable. See Phillips, 6 Wn. App. 2d at 671.

The trial court did not abuse its discretion in admitting the prior written statement as substantive evidence under ER 801(d)(1)(i).

### ER 803(a)(4)

Youker contends that the trial court abused its discretion in admitting Blackburn's statements to forensic nurse examiner Rodriguez. He argues that because the forensic nurse did not provide medical treatment, Blackburn's statements do not fall under the medical diagnosis and treatment exception to the hearsay rule under ER 803(a)(4).

ER 803(a)(4) provides that a statement is excepted from the hearsay rule where it was "made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." The "test for statements made for medical diagnosis or treatments considers the subjective purposes of both the declarant and the medical professional." State v. Burke, 196 Wn.2d 712, 740, 478 P.3d 1096 (2021). A party demonstrates statements are reasonably pertinent to medical diagnosis or treatment when (1) the declarant's motive in making the statements was to promote treatment and (2) the medical professional relied on the statements for treatment purposes. Id.

In State v. Williams, we considered whether a forensic nurse's written record of a rape victim's general account of the attack and responses to a history questionnaire met the standard under ER 803(a)(4). 137 Wn. App. 736, 740-41, 745-47, 154 P.3d 322

18

(2007). We held that the trial court did not abuse its discretion in admitting the statements under the medical diagnosis exception because the victim "underwent the medical examination for 'a <u>combination</u>' of purposes—medical as well as forensic." <u>Id.</u> at 746 (emphasis added). Though the victim testified that she understood she was going to the hospital to "gather evidence," we observed that she "did not state that her <u>only</u> purpose for going to the hospital was to gather evidence." <u>Id.</u> at 746-47 (emphasis added). Additionally, the forensic nurse "testified that the purpose of the questionnaire was twofold: to gather evidence and to identify treatable injuries." <u>Id.</u> at 747. We noted that after the examination the forensic nurse provided the victim with information on sexually transmitted diseases and the risk of pregnancy, and determined what follow-up referrals were necessary and helpful based on collected information. <u>Id.</u>

In the instant case, the State moved pretrial to admit Blackburn's statements to forensic nurse Rodriguez under the hearsay exception for statements made for the purposes of medical diagnosis and treatment. Youker objected, arguing that Rodriguez's role as a forensic nurse examiner was not for the purpose of medical diagnosis or treatment but to provide evidence for criminal prosecution.

After the State made an offer of proof through Rodriguez's testimony, the trial court granted the State's motion as to Blackburn's statements regarding the nature and causation of her injuries, including her statements describing the strangulation and related symptoms. The court analogized the instant case to the forensic nurse examiner's role in <u>Williams</u>.

19

A full review of the State's offer of proof[8] supports the trial court's conclusion that, like Williams, Rodriguez's examination of Blackburn served the dual purposes of medical treatment and evidence gathering for future prosecution.

As part of the State's offer of proof, Rodriguez testified she is a forensic nurse examiner at Providence Intervention Center for Assault and Abuse. As a forensic nurse, Rodriguez described her primary role as "medical care" and testified to, in addition to practicing within her general scope as a nurse, providing a special type of care based on patient exams that focus on injuries sustained by interpersonal violence. Rodriguez testified she is trained to look for injuries that may not be apparent on a surface level exam by an emergency room (ER) doctor and that her forensic exams, which can vary based on the patient's needs, generally take longer than an emergency doctor's exam based on the doctor's limited time with a patient in a busy ER. Rodriguez provides medical information to patients, such as educating patients on related signs and symptoms that may arise that warrant medical attention.[9] Rodriguez documents her exam notes in the patient's medical records and collaborates with the patient's treating ER doctor and nurses, such as providing her findings to the doctor and consulting with

---

[8] Some of Youker's cites to the record are from Rodriguez's trial testimony that occurred after the trial court's ruling under ER 803(a)(4). Because such testimony is not relevant to the issue of whether the trial court abused its discretion based on Rodriguez's testimony provided during the State's offer of proof, we do not consider it. See Mad River Orchard, Inc. v. Krack Corp., 89 Wn.2d 535, 537, 573 P.2d 796 (1978) (observing that purposes of an offer of proof are to inform the trial court of the supporting legal theory, inform the trial court of the specific nature of the offered evidence so the court can make an informed ruling, and to create a record adequate for appellate review).

[9] In his briefing, Youker repeatedly relies on the fact that Rodriguez did not diagnose or prescribe medications to support his assertion that her sole intention was to document injuries and statements to assist with criminal prosecution. However, as we discuss above, Rodriguez testified to the other forms of medical treatment she provided in her role as a forensic nurse examiner. Rodriguez testified that, unlike a doctor, it is not within her scope as a licensed nurse to diagnose or prescribe medications for patients.

the doctor on future treatment as necessary. Though she is trained to take photographs of injuries and collect evidence during a patient exam, Rodriguez testified she does not take direction from law enforcement during a patient exam and does not learn if an exam is associated with a criminal arrest or case until after the exam is underway. Additionally, a patient may consent to the forensic examination but not to the disclosure of the collected information to law enforcement.

Regarding Blackburn's examination, Rodriguez testified she was paged to the hospital based on Blackburn's presentation to the ER with a complaint of physical assault and strangulation.[10] Rodriguez met with Blackburn for nearly three hours. Blackburn gave Rodriguez permission to share the exam report with law enforcement. Rodriguez explained to Blackburn that the forensic exam is more extensive than the emergency doctor's exam. Rodriguez did not view herself as an investigator when she asked Blackburn to tell her how she received her injuries. Rodriguez examined Blackburn for injuries that may not have been readily apparent based on Blackburn's account of the assault and strangulation. Rodriguez also provided Blackburn with follow-up care advice, explaining that "[w]hen a patient has reported strangulation, there is a specific set of guidelines that we give them to look for that would be appropriate to come back to [the] [emergency department] for." Upon completion of the exam, Rodriguez returned Blackburn's care to the ER doctor and provided the exam report to

---

[10] Citing Sergeant Drake's testimony, Youker notes that law enforcement requested Rodriguez's forensic evaluation. Because an analysis under ER 803(a)(4) requires consideration of the subjective view of the medical professional and the declarant, Drake's perspective is immaterial. Burke, 196 Wn.2d at 740. As we reference above, Rodriguez did not testify to examining Blackburn upon law enforcement's request but rather that she was paged by the hospital based on the complained injury.

the doctor. It was not until after Rodriguez's forensic exam was completed that Blackburn was discharged from the hospital.

Because the record supports that Rodriguez's examination was provided in a medical care context and that Rodriguez relied on Blackburn's statements to coordinate her care and provide medical advice, we conclude that Blackburn's statements to forensic nurse Rodriguez were reasonably pertinent to medical treatment.[11] Accordingly, the trial court did not abuse its discretion in admitting Blackburn's statements to Rodriguez under ER 803(a)(4).

### Defense Motion for Mistrial

Lastly, Youker contends that the trial court abused its discretion in denying his motion for a mistrial. Youker argues the remedy of mistrial was necessary to ensure his right to a fair trial following an incident where the jury observed forensic nurse Rodriguez rendering aid to a juror thereby bolstering her credibility as the State's witness.

The record supports that during Rodriguez's testimony, Juror No. 6 lost consciousness, causing other jurors to raise their hands to alert the court. Upon the prosecutor's inquiry, the trial court authorized Rodriguez to assist Juror 6 "[i]f she is in a position to" based on "the emergent nature of the situation." Within two minutes, the other jurors left the courtroom. Prior to being excused, the jurors observed Rodriguez assist Juror 6 by helping her to the ground and elevating her feet. While the court was in recess, Juror 6 received assistance from emergency personnel, returned to

---

[11] Though Blackburn's testimony occurred prior to the court's ruling on the admissibility of her statements to Rodriguez under ER 803(a)(4), Youker does not provide argument regarding Blackburn's perspective of the meeting with Rodriguez.

consciousness, indicated she was in good health, and returned to the jury room where apparent laughter could then be heard. Defense moved for a mistrial. The defense reported that at least one other juror observed Juror 6 thanking Rodriguez outside the courtroom. Defense expressed concern regarding how this and other possible communication involving the jurors could prejudice the jury by bolstering the nurse's credibility and credentials. Before "making a determination … [the jurors] are so prejudiced that the only remedy is a mistrial," the trial court decided to individually question Juror 6 and the other jurors as to any communications that took place. Defense did not object to the court's proposed questions or to the State's request that Juror 6 be excused.

The trial court proceeded to individually ask Juror 6 whether she "discuss[ed] the medical incident with [her] fellow jurors in the jury room after the incident." Juror 6 answered, "Yes." The court then asked, "And did you discuss any conversations you might have had with Nurse Rodriguez, the witness, with your fellow jurors after the incident?" Juror 6 answered, "No." Juror 6 further denied discussing with the other jurors "any impressions [she] had of Nurse Rodriguez" related to how Rodriguez helped her. The trial court subsequently dismissed Juror 6. Neither the State nor defense shared any concerns following the court's questioning of the juror. The trial court then individually questioned each of the remaining 13 jurors with the same questions on the record, requiring them to answer "yes" or "no." Each of the jurors answered "no"[12] to the following questions:

---

[12] The trial court instructed the jurors to answer each of the questions with "yes" or "no." The only extended answer was from Juror 13, who answered in response to the first question, "I'd like to answer yes or no, but I don't know. I didn't hear it. My answer is no." The trial court responded, "That's acceptable." Defense did not respond to Juror 13's specific answer or any of

- First, was there any discussion of witness Nurse Rodriguez and/or her interactions with Juror 6 after Juror 6 came back to the jury room yesterday?
- Does witnessing the medical incident that occurred yesterday, including any interactions that were discussed or observed afterwards in any way cause you to believe that you cannot be a fair or impartial juror in this case?

Youker maintained his request for a mistrial. The court denied the motion. The court found persuasive the Louisiana Court of Appeal's reasoning regarding a similar situation in State v. Licona, 141 So.3d 333 (La. Ct. App. 5th Cir. 2014), and concluded that any prejudice that could have occurred from the jury observing Rodriguez acting within her expected scope as a licensed nurse was minimal. The trial court ruled that the minimal prejudice could be cured by the court's instruction to the jury to disregard the incident in its totality and to not consider Rodriguez's act of administering aid as evidence. Accordingly, the court instructed the jury:

> On February 14, 2024, a juror was administered medical aid by witness, Linnea Rodriguez. You must disregard that incident and any subsequent interactions between the juror and the witness that you may have observed entirely. They are not evidence. They are not relevant to the case or to any issues that you must decide. You are not to consider these events for any purpose in your deliberations.

The court also provided the instruction in written form to the jury. Without waiving his motion for mistrial, Youker did not object to the court's instruction or instruction procedure.

In assessing a party's motion for mistrial, the trial court must determine the prejudicial impact of the asserted trial irregularity. State v. Gamble, 168 Wn.2d 161, 177, 225 P.3d 973 (2010). A trial court should grant the extreme remedy of mistrial "only

---

the other jurors' answers but "maintain[ed] its motion for mistrial for the reasons stated in the briefs and biases we believe could be present."

when the defendant has been so prejudiced that nothing short of a new trial can ensure that the defendant will be fairly tried." State v. Emery, 174 Wn.2d 741, 765, 278 P.3d 653 (2012). To determine the prejudicial effect, the trial court must consider three factors: (1) the seriousness of the irregularity, (2) whether the irregularity involved cumulative evidence, and (3) whether the trial court properly instructed the jury to disregard the irregularity. Gamble, 168 Wn.2d at 177. We review a trial court's denial of a motion for mistrial for abuse of discretion and take a balancing approach in assessing these factors. State v. Allen, 159 Wn.2d 1, 10, 147 P.3d 581 (2006); State v. Garcia, 177 Wn. App. 769, 783, 313 P.3d 422 (2013). We consider the factors with deference to the trial court because the trial court is in the best position to discern prejudice. Garcia, 177 Wn. App. at 776-77.

"A trial court's denial of a mistrial motion will be overturned only when there is a substantial likelihood that the error affected the jury's verdict." Id. at 776. The determinative question is whether, in the context of the trial as a whole and all the evidence, the irregularity was so prejudicial that the defendant did not receive a fair trial. Gamble, 168 Wn.2d at 177, 179. We presume that the jury follows any curative instructions and disregards improper evidence when so instructed. Id. at 178; State v. Cristian, 18 Wn. App. 2d 185, 199, 489 P.3d 657 (2021).

Youker's argument centers around the notion that the jurors' observation of nurse Rodriguez's "selfless act of heroism" biased jurors to view her as a more credible witness. Youker avers that because Rodriguez's testimony was "key" to the State's case, any curative instruction was insufficient to remedy any resultant unconscious or conscious juror bias.

25

We agree with the trial court that the Louisiana Court of Appeal's analysis in Licona,[13] wherein the appellate court affirmed the trial court's denial of the defendant's motion for mistrial on similar facts, is persuasive to the instant record. 141 So.3d at 343-44, 346. In Licona, the court considered whether a doctor-witness' rendering aid to a fainted juror bolstered the doctor's credibility so as to substantially prejudice the defendant. Id. at 339-40, 343-44. The court held that because the doctor-witness' credentials as a doctor had already been established and the doctor's rendering of aid in a medical emergency was "nothing more than what is expected from a doctor," the doctor's credibility was not elevated by her reaction to the emergency situation. Id. at 343. Moreover, the court noted that the doctor's credibility was otherwise bolstered by corroborating evidence of Licona's guilt that would render any error in the court's denial of mistrial harmless. Id. at 343-44.

In the instant case, prior to the medical incident, the trial court found that Rodriguez was an expert witness "with regard to medical treatment as a nurse." Youker's argument in his reply brief that Rodriguez's credibility and experience as a nurse is distinguishable from the doctor's scope in Licona is not well-taken. Prior to the medical incident, the jury heard forensic nurse Rodriguez's testimony specific to her credentials, training, and experience, including that she had been a registered nurse for nearly 29 years and previously worked as a triage nurse. Rodriguez further testified that she is trained and qualified to provide care to a patient in the event the patient experiences a medical problem during an exam, such as if they start to bleed. On this

---

[13] The court's reference is transcribed to "Ricona (ph)," but both parties discuss the trial court's ruling as analogizing the instant case to the Louisiana Court of Appeal's decision in Licona, 141 So.3d 333.

record, we conclude that the trial court did not abuse its discretion in finding that Rodriguez's brief rendering of aid in a medical emergency was consistent with her reasonably expected scope as a nurse.

Youker's assertion that the jurors were inconsistent in their attestations to the court as to communications following the medical incident is not supported in the record. As stated above, Juror 6 said she discussed the medical incident with the other jurors but did not discuss any conversations she had with Rodriguez or any impressions she had of Rodriguez. This is consistent with the remaining jurors' answers to the court that they did not discuss Rodriguez or Rodriguez's interactions with Juror 6 after the incident.

Youker's claim that the remedy of mistrial was necessary to cure the prejudicial effect of the medical incident based on Rodriguez's role as the State's primary witness is not persuasive. The State's case did not rest only on Rodriguez's testimony. Blackburn's injuries were observed and photographed by Sergeant Drake and Rodriguez. Their observations were consistent with what the photographs depicted— marks on the side of Blackburn's neck that were similarly shaped to the width of fingers. See exs. 20-22. Blackburn told Drake that Youker grabbed and squeezed her throat with both his hands so that she was gasping for air and that she felt like Youker was going to kill her. Moreover, Blackburn wrote in her properly admitted police statement, as discussed above, that Youker strangled her. Ex. 5 at 2.

The trial court otherwise took reasonable steps to cure any prejudicial effect caused by Rodriguez's brief assistance to the fainted juror. The trial court excused Juror 6 and instructed the remaining jurors to disregard the incident and any observations of

subsequent interactions between Juror 6 and Rodriguez. The court further instructed the jury that the incident is not evidence and should not be considered for any purpose in their deliberations. We assume the jury followed these instructions. Gamble, 168 Wn.2d at 178.

Based on this record, we cannot say that had the medical incident not occurred, there is a substantial likelihood the jury would not have found Youker guilty. The trial court did not abuse its discretion in denying Youker's motion for mistrial.

CONCLUSION

We affirm.

_____Coburn, J._____

WE CONCUR:

_____Feldman, J._____        _____Smith, J._____